**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,** | ] ] ] ] | |
| **Plaintiff,** | ] ] | **2:15-cv-01016-KOB** |
| **v.** | ] ] | |
| **BROOKWOOD, LLC,** | ] ] | |
| **Defendant.** | ] | |

**MEMORANDUM OPINION**

This case concerns whether a commercial insurance policy covers water damage from a leaking roof.  Brookwood, LLC owns a building that suffered water damage from a leak.  The leak damaged the building and a tenant's property.  Brookwood made claims under its insurance policy with Travelers Property Casualty Company of America, and Travelers denied those claims.  Travelers now requests a declaratory judgment that its policy does not provide coverage for the damages incurred by Brookwood and its tenant.

Travelers makes three arguments in support of its request for a declaratory judgment.  First, it asserts that the damages are not covered because the policy excludes coverage for all of the possible causes of the leak.  It also asserts that its policy does not provide coverage for Brookwood's economic losses, including repairs to the building and the loss of rental income from its tenant.  And finally, Travelers asserts that its policy does not provide coverage for damages to personal property owned by Brookwood's tenant because the lease between Brookwood and its tenant allocates to the tenant the risk of loss to the tenant's property, and thus

1

it is not damage Brookwood is legally obligated to pay. Brookwood, in contrast, maintains that the possible causes of the leak are not excluded and that the "insured contract" exception to the contractual liability exclusion in the liability policy restores coverage for the damage to the tenant's property.

Brookwood counterclaims, alleging bad faith on Travelers's part. Travelers moved for summary judgment as to all claims; that motion has been fully briefed. (Docs. 41, 45, 50). For the reasons stated in this Memorandum Opinion, the court **WILL GRANT** the Motion for Summary Judgment.

## I.    STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if none, (2) whether the moving party is entitled to judgment as a matter of law. *Id.*

In reviewing the evidence submitted, the court must view all evidence and factual inferences drawn from it in the light most favorable to the non-moving party. *See Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (citation omitted). However, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citation omitted).

## II.    FACTUAL AND PROCEDURAL HISTORY

Defendant Brookwood owns the Raymond James building, located at 2900 U.S. Highway

280 in Birmingham, Alabama. Brookwood is a named insured in a commercial insurance policy issued by Travelers that provided coverage for the Raymond James building from April 30, 2014 through April 30, 2015. The policy contains two sections relevant here: the Deluxe Property ("Property") Policy and the Commercial General Liability ("CGL") Policy.[1]

The parties do not dispute that the roof of the Raymond James building leaked, causing damage to the building and to a tenant's property, on or about November 16, 2014, when the Birmingham area received approximately 2.43 inches of rain and experienced winds of up to 24 miles per hour. Specifically, rain entered the roof through openings in the roof's EPDM membrane.[2] At issue is what caused the openings in the roof's EPDM membrane and whether the Property and/or CGL Policies provide coverage for the damage caused by the rain leaking through those openings.

On September 19, 2014, prior to the leak, Mr. Tyler Hixson of Hixson Consultants inspected the Raymond James building's 18-year-old roof and provided a report to Brookwood with his findings and recommendations. The report noted that the EPDM roofing membrane had disbonded in several places, such that "[s]ignificant water entry can occur"; that the EPDM membrane was denatured, patched, and, in multiple locations, open where it met the base flashing; that bridging membrane had been employed; that the ballast had been displaced in some

---

[1] The relevant portions of those two policies are attached as Appendix A to this memorandum opinion.

[2] "EPDM is an extremely durable synthetic rubber roofing membrane (ethylene propylene diene terpolymer) widely used in low-slope buildings in the United States and worldwide. . . . EPDM can be installed either fully adhered, mechanically attached or ballasted, with the seams of the roofing system sealed with liquid adhesives or specially formulated tape." *What Is EPDM?*, EPDM ROOFING ASSOC., http://www.epdmroofs.org/what-is-epdm (last visited September 6, 2017).

3

locations, exposing the membrane to accelerated UV deterioration; and that certain areas were unsealed or incompletely sealed. The Hixson report recommended reseaming open and disbonded seams; replacing the denatured membrane and membrane patches; monitoring the bridging membrane; redistributing displaced ballast; installing pitch pocket filler; and resealing the membrane and inadequately sealed areas. The parties dispute whether Mr. Hixson's recommendations constituted needed repairs or items that would, if performed, maximize the longevity of the roof, and his report does not clarify the nature of his recommendations.

Brookwood hired Leak Solutions to perform the recommended work. Leak Solutions employees started work on the roof on November 4, 2014 and worked through November 7, 2014; they did not return during the week of November 10–14, 2014, or apparently, during the weekend of November 14-16. On November 4, 2014, Brookwood's building engineer, Marlon McElroy, observed Leak Solutions employees using metal shovels to scrape ballast on the roof in the area where the leak at issue in this case later occurred. Upon their departure on November 7, Leak Solutions employees left the EPDM membrane unrepaired and exposed in multiple areas.

Birmingham received .11 inches of rain on November 6, 2014, which did not damage the Raymond James building. (Doc. 43-20 at ECF 129). Then, on or about November 16, Birmingham received nearly two-and-a-half inches of rain. On November 17, 2014, a representative of McWane, Inc., one of Brookwood's tenants, informed Mr. McElroy that rain had leaked into its leased space in the Raymond James building over the weekend of November 14. Brookwood reported the loss to Travelers on November 17 and requested coverage under the Property Policy.

Travelers claim professional Cory Blankenship; Cindy Ritchie, Brookwood's building

manager; Mr. McElroy; and a Hixson representative inspected the building on November 24, 2014. During that inspection, the Hixson representative suggested that thermal shock caused the EPDM membrane to contract and detach from the wall. Travelers subsequently retained Charles Whitley, an engineer, to inspect the loss and provide an opinion as to its cause.

Mr. Whitley inspected the building on December 8, 2014 along with Mr. McElroy, who informed Mr. Whitley both that Leak Solutions had worked on the roof beginning on November 4, 2014 and that he had seen the Leak Solutions employees using their shovels to scrape ballast. Mr. Whitley did not inspect the building until after the roof had been repaired and did not take any measurements during his inspection. He examined the interior damage and the area of the roof where the water had entered, basing his assessment of the entry point on the location of the interior damage. On December 11, 2014, after researching weather and other conditions and reviewing the information provided to him, which included Brookwood's timeline of events, he issued a report to Travelers. The timeline that he relied on details when Leak Solutions worked on the roof and the fact that its employees left the roof exposed when they departed on November 7, 2014.

Mr. Whitley's report to Travelers opined that the removal of the ballast would have made the membrane more susceptible to temperature changes and UV degradation and that UV exposure and wind could have damaged the seams. Further, he stated that shoveling the ballast could have created openings in the membrane through which water entered into the building's interior. Mr. Whitley testified that he obtained no evidence of any punctures or holes in the membrane. Mr. Whitley also testified that he had considered, and eliminated from consideration, wind as a cause of the roof damage, and had not specifically investigated how wind could have

5

affected the Raymond James building's roof. However, he testified that he had confirmed from weather reports that wind speeds had not exceeded 24 miles per hour during the time the roof was uncovered, and that based on his personal experience, "the wind speeds [of up to 24 miles per hour] were not sufficient to have caused any type of uplift on this roof." (Doc. 43-6 at deposition 53:2–4).

Mr. Whitley opined that Leak Solutions's substandard repair work enabled rain to enter the building through the EPDM membrane and damage the interior. Specifically, his report states that both dragging ballast and metal shovels across the membrane, and failing to restore the displaced ballast for 12 days, could have caused seam separation. Mr. Whitley opined that thermal shock did not cause the membrane damage because temperatures changed gradually in the days preceding the leak and because thermal shock does not affect flexible materials like the EPDM membrane. Based on Mr. Whitley's report and information from Brookwood, Travelers denied Brookwood's claim under the Property Policy on December 16, 2014.

In contrast to Mr. Whitley's report, Brookwood's expert, Ben Hixson, identified in his December 23, 2014 report three potential causes of the seam damage that could have operated separately or in some combination: thermal shock, foot traffic in conjunction with use of the roof to hold weights (by window washer personnel who performed their work shortly before Leak Solutions), and foot traffic by Leak Solutions. During his deposition, Mr. Hixson agreed that thermal shock is defined as "the expansion and contraction of the roof system due to extreme temperature changes." (Doc. 43-19 at deposition 115:8–15). He stated that thermal shock could occur where the temperature is warm, causing the seams to "pull apart," or cold, where "the thermal movement would be drawing together." (Doc. 43-19 at deposition 106:5–16). Mr.

Hixson explained that thermal shock could occur suddenly or slowly. Birmingham temperatures reached a high of 76 on November 11 before falling to a low of 23 on both November 14 and 15, 2014.

Mr. Hixson testified that, although he had not conducted the investigation necessary to form an opinion as to whether wind caused the membrane detachment here, he could not rule out wind uplift as a possible cause of the detachment. Specifically, he noted that, although EPDM roofing can generally withstand 30-miles-per-hour winds, he did not know what wind speed would suffice to move unballasted roofing, and agreed that if the ballast had been left in place, the risk of wind uplift "would have been a whole lot less." (Doc. 43-19 at deposition 91:1–4).

Mr. Hixson had previously noted in his report that "the field membrane over the leakage area was *not* adversely made more susceptible for wind uplift potential because the vast majority of the roof area remained covered with the membrane manufacturer's required ten to thirteen pounds ballast rock per square foot." (Doc. 43-20 at ECF 129) (emphasis added). But during his deposition, Mr. Hixson called the potential for "wind vortexes" a possible contributing factor to the membrane damage. At the end of his deposition, Mr. Hixson separately noted that "[e]ven a hard rain impact could have caused the brittle, spliced adhesive to fail." (Doc. 43-19 at deposition 119:17–19).

Mr. Hixson stated that the facts that the seams were already stressed and were left exposed could, separately and together, make the seams more vulnerable to failure from other causes. He also testified that employing a metal shovel to move ballast across EPDM risked accelerating the failure of brittle seams; he further stated that the shovel could puncture or gouge the seams, though he had found no evidence of such puncturing/gouging in the EPDM membrane

here. He clarified that he could not exclude shoveling over the membrane as a cause of the detached seams but did not maintain that was a primary possible cause of the openings.

Mr. Hixson testified that Leak Solutions's using metal shovels to move ballast and then leaving the membrane exposed amounted to "a failure of Leak Solutions to perform their work in a manner that's representative of the industry and the standard of care [the] industry uses[.]" (Doc. 43-19 at deposition 72:4–8). However, in contrast, he had earlier maintained in his report that, "[w]hile some repair contractors use a wide soft bristle broom . . . this shovel procedure pulling ballast is normal and is the predominant means contractors employ to move ballast in preparation to start examining seams and performing seam repairs" and further that "[m]oving rock ballast off walls and exposing field seams is not considered faulty work or workmanship . . . ." (Doc. 43-20 at ECF 128–30).

Travelers's corporate representative Ritchie Royston testified that wind and temperature changes, including thermal shock, would be covered causes of loss but that shrinking and expansion were specifically excluded causes of loss; thus, thermal shock, even if it caused the shrinking and expansion, could not "create a covered cause of loss" in the context of the EPDM roof. (Doc. 43-23 at deposition 46:8).

After Travelers denied Brookwood's claim under the Property Policy, Brookwood submitted to Travelers a claim for coverage under the CGL Policy on December 19, 2014. Brookwood's claimed damages included (1) the cost of repairing the interior damage; (2) the cost of replacing its tenant, McWane's, damaged furniture; and (3) an approximately $61,000 rent reduction Brookwood provided to McWane. Email communications show that Travelers professionals handling the CGL claim reviewed the facts and relevant documents and, after

determining that "the contractor that was doing the work may have been the proximate cause of causing this roof leak and subsequent damage," attempted to help Brookwood recover damages from Leak Solutions and its insurance carrier, as well as assess Brookwood's potential liability to McWane. (Doc. 43-5 at ECF 4).

The rental agreement between Brookwood and its tenant McWane provides, in relevant part, that Brookwood would make "necessary repairs" to the building and "repair any damage to Tenant's Premises that occurs as a result of or in connection with the repair of such defective condition . . . ." (Doc. 43-21 at ECF 6–7). The agreement further required that "[McWane] shall maintain insurance written on an 'all-risk' or broad form for the full replacement cost of its furniture, furnishings, fixtures, improvements and other property," with the policy waiving the right of subrogation against Brookwood where McWane could obtain such language. (*Id.* at ECF 8). And the lease provided for abatement of the rent if the premises were, through no fault of McWane, rendered uninhabitable.[3]

Despite further discussions between Travelers and Brookwood, the parties continue to disagree about whether the CGL Policy covers the claimed damages. Travelers filed this suit in June 2015, seeking a declaratory judgment that it owes no coverage for the rain damage to the Raymond James building and McWane's property, under either the Property or CGL Policies. Brookwood separately filed suit against Leak Solutions in July 2016, alleging that the water damage was the result of Leak Solutions's negligent and wanton actions. That case remains pending in Jefferson County Circuit Court.

---

[3] The relevant portions of the lease are attached in full as Appendix B to this memorandum opinion.

## III.   DISCUSSION

The parties agree that this court should apply Alabama substantive law to this dispute. *See St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 894 n.1 (11th Cir. 2009) (citing *Cherokee Ins. Co., Inc. v. Sanches*, 975 So. 2d 287, 292 (Ala. 2007)) (explaining that when a federal court sitting in diversity in Alabama interprets an Alabama insurance policy, it applies Alabama substantive law). Under Alabama law, the insured bears the burden of initially proving coverage under the policy. *See FCCI, Inc. v. Capstone Process Sys., LLC*, 49 F. Supp. 3d 995, 998 (N.D. Ala. 2014) (citing *Colonial Life & Acc. Ins. Co. v. Collins*, 194 So. 2d 532, 535 (Ala. 1967)). The insurer bears the burden of demonstrating that an exclusion to coverage applies. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. Catherine of Siena Parish*, 790 F.3d 1173, 1181 (11th Cir. 2015) (citing *Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 12 (Ala. 2001)). But the insured is responsible for showing that an exception to an exclusion restores coverage. *See USF Ins. Co. v. Metcalf Realty Co., Inc.*, No. 2:12-cv-02529-AKK, 2013 WL 4679833, at *5 (N.D. Ala. Aug. 30, 2013) (citation omitted).

"Exceptions to coverage are interpreted as narrowly as possible to maximize coverage, and are construed strongly against the insurance company that issued the policy." *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts Bros., Inc.*, 550 F. Supp. 2d 1295, 1303 (S.D. Ala. 2008) (citing *Porterfield v. Audubon Indem. Co.*, 856 So. 2d 789, 806 (Ala. 2002)). But by the same token, "[i]f there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy by making a new contract for the parties." *See id.* (quoting *Shrader v. Emp'rs Mut. Cas. Co.*, 907 So. 2d 1026, 1034 (Ala. 2005)). "The issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. If the terms

within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court . . . ." *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308 (Ala. 1999) (citing and quoting *McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991)).

## A.    Coverage Under Property Policy

The Property Policy is an "all-risk" policy, meaning that it provides coverage for all physical damage to covered property *unless* a cause of loss is specifically excluded or limited. *See St. Paul Fire & Marine Ins. Co. v. Britt*, 203 So. 3d 804, 809–10 (Ala. 2016) (citations omitted) (describing all-risk policies as covering all fortuitous losses that are not attributable to the insured's misconduct or fraud and that are not specifically excluded).

The parties do not dispute that Brookwood has met its burden to demonstrate initial coverage; namely, that its covered property was fortuitously physically damaged through no misconduct or fraud on Brookwood's part. But Travelers points to the Rain Limitation in section D. Limitations 1.c.(1) that excludes coverage for rain damage to the interior of the covered building or personal property *unless* the building first sustains damage by a covered loss to its roof.[4] The Rain Limitation provides that interior damage caused by rain is covered *if* "[t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain . . . enters[.]" (Doc. 43-17 at ECF 48).

Travelers has established that the damage to McWane's space and property was caused by

---

[4] The parties have not briefed the question of whether the damage to the roof itself is covered by the Property Policy. However, the court notes that its analysis of whether a covered cause of loss caused the damage to the roof, in its determination of whether an exception to the Rain Limitation applies, necessarily means that the damage to the roof is not covered.

rain, so the damage is excluded *unless* Brookwood shows that the interior rain damage was caused by a covered cause. Accordingly, to survive summary judgment, Brookwood must produce evidence on which a reasonable jury could find that the rain damage was caused by a "covered cause of loss." (Doc. 43-17 at ECF 48). A genuine dispute of fact exists regarding causation, but the court finds the dispute immaterial because none of the proposed causes of the rain damage expounded by Brookwood entitle it to recovery under the Property Policy.

Brookwood contends that wind, temperature change, and thermal shock are all covered causes of loss that *possibly* caused the leak, thus preventing application of the Rain Limitation; it maintains that these covered causes are not inconsistent with faulty workmanship by Leak Solutions.[5] Travelers asserts that Leak Solutions's faulty repair work caused the damage to the EPDM membrane that permitted water to leak into the building and that defective workmanship is an excluded cause of loss. The court notes that the only type of faulty workmanship at issue is Leak Solutions's use of metal shovels to move ballast and its failure to restore the ballast to cover the membrane when workers left the job site on November 7, 2014.

First, to the extent faulty workmanship, inadequate maintenance, and/or wear and tear

---

[5] The court notes that Brookwood, in its statement of facts, references in list form—several times without citation—various elements to which the roof was exposed and which potentially caused the seam failure. For example, it maintains, "Ben Hixson testified that either temperature changes, thermal shock, wind, foot traffic, or rain impact could have been a cause of loss of the rain intrusion." (Doc. 45 at 12). However, in argument throughout the rest of the brief, Brookwood advances only three potential causes of the loss. Accordingly, the court considers only those three potential causes in determining whether Brookwood has met its burden to establish coverage, both because it is incumbent upon Brookwood to demonstrate that a jury could find the application of an exception to an exclusion from coverage and because "[t]he court need only consider cited materials" in deciding whether to enter summary judgment. *See* FED. R. CIV. P. 56(c)(3). Brookwood has presented neither argument in briefing nor evidence explaining why UV degradation, rain impact, or foot traffic is a *covered* cause of loss that would bring the interior damage at issue here back within the coverage of the Property Policy.

caused the roof damage, they are excluded causes of loss. (Doc. 43-17 at ECF 45, 46 (providing that loss or damage from wear and tear or from "[f]aulty, inadequate or defective" workmanship or maintenance is not covered)). Brookwood argues that the fact that the roof did not leak after the rainfall on November 6, 2014, proves that faulty workmanship did not cause the roof damage. Leak Solutions's actions on November 7, particularly leaving the job site without restoring ballast, may have still been the primary cause of the roof damage; further, even a showing that faulty workmanship did not cause the seam damage does not meet Brookwood's burden to show that an exception to the Rain Limitation applies—namely, that a *covered* cause of loss produced the damage.

As to Brookwood's proposed causal agents, the parties agree that temperature change may be a covered cause of loss. But these facts do not simply involve temperature change that produced damage that then permitted rain to enter the building. Rather, on this record, temperature change could only have caused damage to the Raymond James building by causing thermal shock.[6]

And thermal shock, on these facts, is not a covered cause of loss. Thermal shock is a *reaction to* temperature changes; it is defined as "the expansion and contraction of the roof system *due to* extreme temperature changes." (Doc. 43-19 at Mr. Hixson's deposition 115:9–11). The Property Policy specifically excludes coverage for damage caused by or resulting from

---

[6] Brookwood notes in part of a line in its brief that Mr. Hixson opined that the extreme hot-to-cold temperature change "would have been sufficient to . . . melt the exposed EPDM's adhesive seams." (Doc. 45 at 20). However, the cited portions of the record say no such thing. Mr. Hixson's opinion on the effect of the temperature changes was limited to his position that the expansion and contraction of the membrane could have caused the seams to disbond, thus permitting water entry.

"[s]ettling, cracking, *shrinking*, bulging, or *expansion*." (Doc. 43-17 at ECF 45) (emphasis added). "Shrink" is defined as "to contract to a less extent . . ." and is a synonym for "contract"; the two terms may be used interchangeably. *See Shrink*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/shrink (last visited September 6, 2017). The plain language of the policy thus excludes thermal shock as a covered cause of loss when it causes cracking, shrinking, and expanding. Brookwood argues that Travelers is precluded from arguing that the shrinking/expansion provision applies because it failed to investigate thermal shock as a potential cause of the roof damage. But it cites no authority for this proposition.

Brookwood also argues that the shrinking/expansion and wear and tear exclusions do not apply because section C.2.i of the policy provides that Travelers will provide coverage when an excluded cause of loss "results in" a "specified cause of loss." One specified cause of loss is a windstorm, and Brookwood contends that the storm that occurred on the same day as the damage to the roof qualifies as a windstorm, meaning that, as Brookwood reads the policy, the damage should be covered. Brookwood's argument misses the mark. Even if the storm was a windstorm, and therefore a "specified cause of loss," it would not be covered under section C.2.i of the policy. That section provides coverage for an excluded cause of loss when that excluded cause of loss "results in" a specified cause of loss. The shrinking/expansion of the roof or the wear and tear did not "result in" the windstorm.

For the same reason, the "ensuing loss" exception to the faulty workmanship and maintenance exclusions in section C.3.c. of the policy does not apply. That section provides: "If an excluded cause of loss that is listed in 3.c. above [including faulty workmanship or inadequate maintenance] results in a Covered Cause of Loss, we will pay for the resulting loss or damage

14

caused by that Covered Cause of Loss. . . ." (Doc. 43-17 at ECF 46). But neither faulty workmanship nor inadequate maintenance could have *caused* either thermal shock or wind. That covered causes of loss "*occurred after* any alleged improper workmanship, repair, construction, or maintenance on behalf of Leak Solutions," as Brookwood argues, is insufficient to trigger the application of the exception. (Doc. 45 at 25) (emphasis added); *see Travelers Indem. Co. v. Bd. of Cty. Comm'rs*, No. 10-cv-02160-MSK-CBS, 2012 WL 1059976, at *4 (D. Colo. Mar. 29, 2012) (reading identical policy language providing coverage for any "resulting loss" where an excluded cause of loss "*results in* a Covered Cause of Loss" as requiring causation: "In other words, although a construction defect, itself, is not covered by the policy, if the defect causes (*i.e.* 'results in') a 'Covered Cause of Loss,' and that 'Covered Cause' in turn results in property damage, the resulting property loss is covered.").

Finally, Brookwood has produced at best only a scintilla of evidence showing that wind damage was a cause of the leak, which is insufficient to meet its summary judgment burden to produce evidence to create a genuine issue of material fact about whether an exception to the Rain Limitation applies. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Neither expert investigated wind as a cause of the membrane damage. Mr. Hixson testified only that he *could not rule it out* as a possible cause of the roof leak, despite stating in his report that "the field membrane over the leakage area was *not* adversely made more susceptible for wind uplift potential . . . ." (Doc. 43-20 at ECF 129) (emphasis added).

Mr. Hixson's deposition testimony that directly contradicts his earlier report is

insufficient to create a jury question as to whether wind damage, which is indisputably a covered cause of loss, caused the relevant damage here. *Accord Divine Motel Grp., LLC v. Rockhill Ins. Co.*, No. 3:14-cv-31-J-34JRK, 2015 WL 4095449, at *8 (M.D. Fla. July 7, 2015) (finding that no genuine issue of material fact existed where one expert testified outside the scope of his investigation about his opinion, formed after examining only two pictures of the damage, that wind "could not be ruled out" as a cause of damage, because the opposing expert definitively ruled out wind as a cause of the damage).

Because Brookwood has failed to meet its burden to produce *evidence* on which a jury could find that a covered cause of loss produced the leak through which the rain entered, thus establishing the applicability of an exception to the Rain Limitation, it cannot recover under the Property Policy any damages incurred as a result of the November 16, 2014 roof leak. *Accord Divine*, 2015 WL 4095449, at *7, 10 (granting summary judgment to insurer because the insured "fail[ed] to identify what other 'Covered Cause of Loss' caused the damage to the roof or walls to permit the rain to enter"). Because no coverage exists under the Property Policy, the court **WILL GRANT** summary judgment for Travelers on its request for a declaratory judgment as to that policy.

### B.     Coverage Under CGL Policy

The "Insuring Agreement" provision of the liability policy provides: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Doc. 43-17 at ECF 99).

Section 2.j.(1) excludes from coverage property damage to property Brookwood "**own[s]**, rent[s], or occup[ies], including any costs or expenses **incurred by [Brookwood]**, or any other

person, organization or entity, **for repair**, replacement, enhancement, restoration or **maintenance of such property** for any reason, including prevention of injury to a person **or damage to another's property** . . . ." (Doc. 43-18 at ECF 4) (emphasis added). The policy defines "property damage" as "[p]hysical injury to tangible property, **including all resulting loss of use of that property**." (*Id.* at ECF 15) (emphasis added). These provisions clearly exempt from CGL Policy coverage both the reimbursement Brookwood seeks for repairing the Raymond James building and the loss of rental income from McWane.

As for the cost of replacing McWane's furniture, Brookwood was never "legally obligated" to pay for McWane's furniture, for two reasons. (Doc. 43-17 at ECF 99). First, the rental agreement between Brookwood and McWane provides: "Landlord shall repair any damage to *Tenant's Premises* that occurs as a result of or in connection with the repair of such defective condition, but Landlord *shall not be responsible for other damages resulting from such defective condition*." (Doc. 43-21 at ECF 7). In other words, Brookwood was responsible for making "necessary repairs" to defects in the roof and other parts of the building itself, including water damage to the space rented by McWane, but was not liable for damages caused by those defects. (*Id.* at ECF 6). Second, the lease allocates the risk of loss of McWane's furnishings to McWane and requires that McWane's insurer waive the right of subrogation against Brookwood.

Brookwood argues that the "insured contract" exception to the contractual liability exclusion (section I.2.b.(2)) provides coverage for the reimbursements it seeks. The contractual liability provision, section I.2.b., excludes coverage for "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." (Doc. 43-18 at ECF 2).

As another judge in this district recently explained:

> Under Alabama law, the purpose of contractual exclusions such as the present one is not to exclude liability for claims *sounding in contract* but, instead, to exclude an insured's liability to a third party that the insured *expressly assumed* in an *indemnity*, or *hold-harmless agreement*. As the Fifth Circuit stated in a persuasive opinion, *Ingalls Shipbuilding v. Federal Insurance Co.*, 410 F.3d 214 (5th Cir. 2005), courts "have consistently interpreted the phrase 'liability assumed by the insured under any contract' to apply only to indemnification and hold-harmless agreements, whereby the insured agrees to 'assume' the tort liability of another. This phrase does not refer to the insured's breaches of its own contracts." *Id.* at 222 (quoting 1 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 7.05, at 460 (12th ed. 2004)).

*Owens Ins. Co. v. Alabama Powersport Auction, LLC*, No. 5:14–cv–00147–CLS, 2015 WL 3439126, at *10 (N.D. Ala. May 28, 2015). Thus, damages owed by Brookwood to a third party under an indemnity agreement would not be covered because of the contractual liability exclusion. But damages owed by Brookwood to McWane for breach of the parties' own rental contract are covered by the liability policy if not otherwise excluded.

However, that fact does not mean that the CGL Policy provides coverage for the expenses incurred by Brookwood in fulfilling its contractual obligations. Section 2.j.(1) makes clear that the Policy provides no coverage for repairs to Brookwood's own property. And the rental agreement allocates the risk of loss to McWane's furniture to McWane. Thus, by the terms of the rental contract, Brookwood is not "legally obligated to pay" for damages to McWane's personal property caused by the leak on or about November 16, 2014.

Accordingly, Brookwood may not recover the reimbursements it seeks under the CGL Policy. The court **WILL GRANT** summary judgment to Travelers on its request for a declaratory judgment as to that policy.

### C.     Brookwood's Counterclaims

Brookwood counterclaims for bad faith, alleging that Travelers denied a claim that is covered under Brookwood's policy. The Alabama Supreme Court expressly rejected the "argument that the tort of bad faith provides a cause of action that is separate and independent of an insurance contract." *Slade*, 747 So. 2d at 318. An insured's claim of bad faith against the insurer may succeed only when the insured is entitled to coverage under its policy. *Id.* at 317 ("[W]hen this Court recognized the tort of bad faith, it intended to limit liability under that tort to those instances in which the insured's losses were covered under the policy."). Thus, Brookwood's bad faith investigation claim fails, as do all versions of bad faith claims, because Travelers owed no coverage and thus did not breach the insurance contract. *See id.* at 318 ("[T]o prove a bad-faith-failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured's loss was covered under the terms of the contract. This result preserves the link between contractual liability and bad-faith liability . . . .").

Because Brookwood is not entitled to coverage under its commercial Travelers policy, its counterclaims fail as a matter of law. Travelers is entitled to summary judgment on these counterclaims.

## IV.     CONCLUSION

Because Brookwood has failed to meet its burden to establish that an exception to the Rain Limitation applies, the Property Policy does not provide coverage for damages stemming from the Raymond James building's roof leak on or about November 16, 2014.  Nor does the CGL policy provide coverage for those damages. Given that its Travelers policy does not provide coverage, Brookwood's counterclaims fail as a matter of law. Thus, the court **WILL GRANT**

Travelers's Motion for Summary Judgment and enter a declaratory judgment in its favor as to coverage under the commercial policy and enter judgment in its favor on Brookwood's counterclaims.

The court will enter a separate final Order consistent with this opinion.

**DONE** this 6th day of September, 2017.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

## PROPERTY POLICY

**A.  COVERAGE**

We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.

. . .

**B.  COVERED CAUSES OF LOSS**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

    **1.**    Excluded in Section **C.**, Exclusions;

    **2.**    Limited in Section **D.**, Limitations; . . .

**C.  EXCLUSIONS**

. . .

    **2.**    We will not pay for loss or damage caused by or resulting from any of the following:

. . .

        **i.**    **Other Types of Losses**

        **(1)**    Wear and tear;

        . . .

        **(4)**    Settling, cracking, shrinking, bulging, or expansion;

        . . .

        But if an excluded cause of loss that is listed in Paragraphs (1) through (7) above results in any of the "specified causes of loss" or building glass breakage, we will pay for the loss or damage caused by such "specified causes of loss" or building glass breakage.

        . . .

    **3.**    We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** . . .

        **c.**    Faulty, inadequate or defective:

        . . .

        **(2)**    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

        . . .

        **(4)**    Maintenance;

        of part or all of any property on or off the described premises.

        If an excluded cause of loss that is listed in 3.c above results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss. . . .

**D.  LIMITATIONS**

The following limitations apply to all coverage forms and endorsements unless otherwise

stated.

    **1.**    We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

    . . .

    **c.**    The "interior of a building or structure", or to personal property in the building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

    **(1)**    The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, or sand or dust enters; . . . .

**J.**    **DEFINITIONS**

    . . .

    **12.**    **"Specified Causes of Loss"** means the following: Fire; lightning; explosion; windstorm or hail; . . . .

(Doc. 43-17 at ECF 22, 39, 42, 45–48, 57).

## CGL POLICY

**SECTION I – COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

    **1.**    **Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

    **2.**    **Exclusions**

    This insurance does not apply to:

    . . .

    **b.**    **Contractual Liability**

    "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    . . .

    **(2)**    Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. . . .

    **j.**    **Damage To Property**

    "Property damage" to:

    **(1)**    Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or

damage to another's property; . . . .

**SECTION V – DEFINITIONS**

. . .

**9.** "Insured contract" means:

    **a.** A contract for a lease of premises. . . .

**17.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. . . .

(Doc. 43-17 at ECF 99; Doc. 43-18 at ECF 1, 4, 12–13, 15).

# APPENDIX TWO
## EXCERPTS FROM RENTAL AGREEMENT

7. **Repairs.**

. . . .

    (b)    Landlord at its expense . . . shall make necessary repairs to the roof, structural parts, outside walls, elevators, heating, air conditioning, electrical, plumbing and other utility systems of Building, and within the Premises to ceiling tile and fixtures appertaining to utility systems . . . . Tenant shall at once report in writing to Landlord any defective condition known to Tenant which Landlord is required to repair. Landlord shall repair any damage to Tenant's Premises that occurs as a result of or in connection with the repair of such defective condition, but Landlord shall not be responsible for other damages resulting from such defective condition.

        . . .

10. **Insurance.**

. . .

    (b)    Tenant shall maintain insurance written on an "all-risk" or broad form for the full replacement cost of its furniture, furnishings, fixtures, improvements and other property. Tenant agrees, if obtainable, to include in Tenant's policy or policies appropriate clauses pursuant to which the insurance company or companies (i) waive the right of subrogation against Landlord or any tenant of space in the Building or both with respect to losses payable under such policy or policies and (ii) agree that such policy or policies shall not be invalidated by such waiver of subrogation.

        . . .

11. **Destruction.**

. . .

    (b)    The Rent shall, to the extent the Premises have been rendered untenantable, be proportionately abated from the date of any fire or casualty not caused by the fault or negligence of Tenant, Tenant's servants, agents, employees or invitees, until the Premises are repaired, and shall be adjusted as of the date of the fire or casualty in the event this Lease is terminated pursuant to Paragraph 11(a) hereof.

(Doc. 43-21 at ECF 6–9).